STREETER, J.,
Concurring and Dissenting.—There is a difference between a delusion with no basis in objective reality, commonly called a hallucination, and a delusion based on a distorted perception of reality. The distinction may seem like a matter of semantics, but it has substance. Both forms of delusion are recognized as psychoses in the scientific literature. (See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th rev. ed. 2000) p. 324 (DSM-IV-TR) [drawing distinction between “bizarre” delusions which are not based in reality and “nonbizarre delusions” which are reality based].)[1] I part ways with the majority because I think the semantics mattered in this case. Monica McCarrick’s guilt phase defense was an attempt to limit her culpability to second degree murder. Because CALCRIM No. 627[2]—which framed that defense for the jury—speaks solely in terms of “hallucinations,” the People were able to argue in closing that she was not hallucinating on the day she killed her children, and so there was nothing in the evidence to negate premeditation and deliberation. The argument was devastating, because it was irrefutably true: On the day of the killings and in the weeks before, McCarrick was suffering from grotesque, reality-based delusions, but not from hallucinations.
I.
The language of CALCRIM No. 627 has its genesis in People v. Padilla (2002) 103 Cal.App.4th 675, 677-678 [126 Cal.Rptr.2d 889] (Padilla), a case *253 involving a prisoner, Padilla, who killed his cellmate by gouging his eyes out. At trial, Padilla tried to present “the testimony of two psychologists [to explain] that he committed a retaliatory homicide after hallucinating that [the cellmate] had killed [his] father and brothers.” (Id. at p. 677.) The court excluded the testimony at the guilt phase, but allowed it at the sanity phase. (Ibid.) On appeal from his first degree murder conviction, Padilla argued it was error to exclude the testimony during the guilt proceedings. He contended, first, that the testimony was relevant to a defense of sudden provocation or passion, which would have eliminated malice entirely and reduced the crime from murder to manslaughter, and, second, that it was admissible to negate premeditation and deliberation, which would have reduced his culpability for murder from first to second degree. The Court of Appeal rejected the former point, but agreed with the latter. (Id. at pp. 677-678.)
The opinion in Padilla explains that a “hallucination is a perception with no objective reality. (American Heritage Dict. (4th ed. 2000) p. 792 [‘[perception of visual, auditory, tactile, olfactory, or gustatory experiences without an external stimulus’ (italics added)]; Oxford English Dict. (2d ed. 1989) p. 1047 [‘apparent perception (usually by sight or hearing) of an external object when no such object is actually present’ (italics added)]; Webster’s 3d New Internat. Dict. (1986) p. 1023 [‘perception of objects with no reality’ (italics added)].) A perception with no objective reality cannot arouse the passions of the ordinarily reasonable person.” (Padilla, supra, 103 Cal.App.4th 675, 678-679.) With this definition in mind, the court turned to Padilla’s two cited points of error, holding as follows. First, “[f]ailing the objective test, [a] hallucination cannot as a matter of law negate malice so as to mitigate murder to voluntary manslaughter—whether on a ‘sudden quarrel or heat of passion’ theory of statutory voluntary manslaughter [citations] or on a ‘diminished actuality’ theory of nonstatutory voluntary manslaughter [citations].” (Padilla, supra, 103 Cal.App.4th at p. 679.) Second, a hallucination—as a subjective phenomenon playing out in the defendant’s mind—can “negate deliberation and premeditation so as to reduce first degree murder to second degree murder.” (Id. at p. 677.) This second prong of the holding in Padilla is the animating principle behind CALCRIM No. 627, which instructs juries they may “consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation.”[3]
*254 II.
Also relevant here, although tangentially, is People v. Mejia-Lenares (2006) 135 Cal.App.4th 1437 [38 Cal.Rptr.3d 404] (Mejia-Lenares). In Mejia-Lenares, the appellant, Mejia-Lenares, was convicted of second degree murder after “he fatally stabbed Harry Howard out of fear that Howard was transforming into the devil and wanted to kill him. Appellant conceded that he just imagined Howard was turning into the devil . . . .” (Id. at p. 1444.) Like Padilla, Mejia-Lenares tried to use his hallucinations to defeat malice outright, thereby reducing his crime from murder to manslaughter, but rather than argue provocation or passion, which was Padilla’s defense, Mejia-Lenares argued imperfect self-defense. “[A] reasonable person would not have perceived the circumstances as life-threatening,” Mejia-Lenares contended, but in his case, “because of his mental disease,” he “actually but unreasonably believed Howard was threatening his life and so he needed to defend himself by using lethal force.” (Id. at p. 1445.) The Court of Appeal rejected this argument, extending the first prong of Padilla’s holding to imperfect self-defense. (Id. at p. 1446.)
At the time, the language of CALJIC No. 8.73.1, an instruction that existed before CALCRIM No. 627, embodied only Padilla’s second prong—which remains the case today in both forms of this pattern instruction—thus permitting juries to consider evidence of hallucination as it may be relevant to the degree of a murder. Appellant Mejia-Lenares tried to claim CALJIC No. 8.73.1 should have been modified in his case to permit consideration of hallucinations not just in determining the degree of murder, but also in determining the issue of malice aforethought as a predicate whether murder may be found at all. The Court of Appeal rejected this contention, explaining: “To allow a true delusion—a false belief with no foundation in fact—to form the basis of an unreasonable-mistake-of-fact defense erroneously mixes the concepts of a normally reasonable person making a genuine but unreasonable mistake of fact (a reasonable person doing an unreasonable thing), and an insane person. Thus, while one who acts on a delusion may argue that he or she did not realize he or she was acting unlawfully as a result of the delusion, he or she may not take a delusional perception and treat it as if it were true for purposes of assessing wrongful intent. In other words, a defendant is not permitted to argue, ‘The devil was trying to kill me,’ and have the jury assess reasonableness, justification, or excuse as if the delusion were true, for purposes of evaluating state of mind.” (Mejia-Lenares, supra, 135 Cal.App.4th at p. 1456.)
Our Supreme Court recently adopted the holding of Mejia-Lenares and embraced its reasoning in People v. Elmore (2014) 59 Cal.4th 121, 130 [172 Cal.Rptr.3d 413, 325 P.3d 951] (Elmore), a case in which the defendant, *255 Elmore, who, “by all accounts, [was] mentally ill,” “had repeatedly been institutionalized and diagnosed as psychotic.” “On the day of the killing [Elmore] . . . became fidgety and anxious” and “[a]t one point . . . began to crawl under cars as his family and a friend tried to speak with him.” {Ibid.) He then went out on the street with a paint brush handle honed into a sharp weapon-like object, and, without warning or provocation, suddenly accosted an unsuspecting passerby on the sidewalk, Ella Suggs, who did not know Elmore and never said a word to him. Elmore stabbed Suggs to death with the paint-brush handle. (Ibid.) At trial, he gave an incoherent and confused account of his actions, explaining that “ ‘somebody [said] something violent’ ” to him on the street, but he could not say who it was or whether it was a man or woman. (Id. at p. 131.)
The question in Elmore was, as it had been in Mejia-Lenares, “whether the doctrine of unreasonable self-defense is available when belief in the need to defend oneself is entirely delusional.” (Elmore, supra, 59 Cal.4th at p. 130.) Adopting the holding of Mejia-Lenares, the court said no, explaining that “[h]ere, defendant claims his request for an instruction on unreasonable self-defense should have been granted, even though his perception of a threat was entirely delusional.” (Id. at p. 134; see id. at p. 138 [referring to “purely delusional perceptions of threats to personal safety”].) The court explained that “[t]he line between mere misperception and delusion is drawn at the absence of an objective correlate. A person who sees a stick and thinks it is a snake is mistaken, but that misinterpretation is not delusional. One who sees a snake where there is nothing snakelike, however, is deluded. Unreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant’s mind.” (Id. at p. 137.)
III.
Elmore and Mejia-Lenares involved, respectively, an “entirely delusional” belief, “divorced from the circumstances,” and not grounded on an “objective correlate” (Elmore, supra, 59 Cal.4th at p. 137), and “a perception of facts not grounded in reality” (Mejia-Lenares, supra, 135 Cal.App.4th at p. 1453). They do not address whether a defendant laboring under a subjective misperception of reality may use that type of delusion to argue she did not actually deliberate or plan a homicidal act.
Padilla does address that question, and, quite properly, the trial court considered its applicability here after entertaining argument specifically focused on whether, under the second prong of Padilla, McCarrick would be allowed to try to negate premeditation and deliberation based on testimony from various percipient witnesses who observed her bizarre and increasingly irrational behavior in the days and weeks before the killings. With the *256 preliminary observation that “we are in a very tricky area,” the court ruled that she would be allowed to do so. This ruling was unquestionably correct, fully in line not just with Padilla but with what has come to be called the defense of “diminished actuality,” since that defense put to the test whether the People proved McCarrick “ ‘actually formed’ ” the specific intent requisite for first degree murder. (People v. Vieira (2005) 35 Cal.4th 264, 292 [25 Cal.Rptr.3d 337, 106 P.3d 990], quoting People v. Coddington (2000) 23 Cal.4th 529, 582 [97 Cal.Rptr.2d 528, 2 P.3d 1081], overruled on other grounds in Price v. Superior Court (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618]; see Pen. Code, § 28; People v. Mills (2012) 55 Cal.4th 663, 671 [147 Cal.Rptr.3d 833, 286 P.3d 754] (Mills).)
Where the trial court went wrong was in limiting Padilla to its facts. It is understandable why the court did so, because Padilla is a hallucination case and because the language of CALCRIM No. 627 speaks only of hallucinations. But the rationale for CALCRIM No. 627, articulated in Padilla itself, is not confined to mental disturbance as it happened to be manifested in that case (or for that matter in Elmore or Mejia-Lenares).[4] Since all forms of delusion and hallucination involve subjective disturbances within the mind, there is no reason a defendant should be limited to arguing mental delusion as the basis for a diminished actuality defense only in a situation where she has acted under the influence of some imagined or manufactured version of reality, to the exclusion of delusionary thinking more broadly defined. In my view, CALCRIM No. 627 is flawed because it limits diminished actuality defenses based on mental disturbance to hallucinations. If we were to reach the guilt phase instructional issue McCarrick has raised here—and I think we should—I would therefore hold it was error not to modify CALCRIM No. 627 sua sponte to encompass all forms of mental delusion, including hallucinations.
Because it is rare that the difference matters, courts do not draw a crisp distinction between “hallucinations” and “delusions.” Some of the reported cases use the term “delusion” in a manner that appears to equate it in meaning with “hallucination,”[5] others use it in its broader sense to mean misperceptions of objective reality,[6] and others seem to use both terms and *257 both concepts interchangeably.[7] Even cases that commit definitively to one of these two terms, upon probing, are not so clear. For example, the majority seems to suggest that, although the Padilla court used only the term “hallucination,” it might have meant something broader because there was “no indication the defendant was suffering under a visual or auditory hallucination in which he believed he was seeing or hearing the actual killings.” (Maj. opn., ante, at p. 245, fn. 7.) I question this interpretation of the case,[8] but would suggest that the fact we read the case so differently provides yet another illustration of the uncertain meaning of the labels “hallucination” and “delusion” as used in case law.
In the end, not much can be gleaned from how we appellate judges use the terms “delusion” and “hallucination,” since appellate usage typically tracks the choice of terminology by testifying alienists in the cases under review, often where both phenomena were involved and there was no reason to make *258 a distinction.[9] The lack of terminological precision in the case law simply underscores why, to eliminate any confusion in future applications of CALCRIM No. 627 (or its CALJIC counterpart), we should address whether this pattern instruction should have been modified here to cover not just hallucinations, but all forms of delusionary thinking, whether based on a false or manufactured perception of objective reality or some distorted perception of real events. This case illustrates how consequential the issue can be, if left to juries to decipher without specific guidance.
IV.
The majority suggests counsel on both sides and the court agreed that delusions and hallucinations are one and the same. I read the record somewhat differently. In pretrial argument on a motion in tintine concerning the applicability of Mejia-Lenares—an argument McCarrick lost when the trial court ruled, correctly, that her irrational fears could not support a claim of imperfect self-defense—her counsel was quite clear that these fears were not “completely delusional as they were in Mejia-Lenares.” Later, during the guilt phase trial, when the admissibility of McCarrick’s fears to negate premeditation and deliberation under the second prong of Padilla’s holding arose, counsel did, it is true, seem to accept the idea that delusions and hallucinations are interchangeable, but she did so only after the court sounded a note of skepticism about the appropriate terminology, interjecting, “I don’t know if we call it a delusion,” and then immediately asking whether “we call it a hallucination?” Although the People pin blame on the defense for equating delusions and hallucinations, the quote from McCarrick’s counsel to which they cite is a response to the court’s inquiry during this colloquy, and *259 appears to be nothing more than an effort to fit the evidence within a reading of the law the court seemed inclined to take—and eventually did take.
Who originally came up with the notion that the term “hallucinations,” alone, may be used to describe the evidence of McCarrick’s paranoid delusions is not definitively clear in the record, but the sequence of events suggests it is more fairly attributable to the People than to the defense. The specific issue under discussion when this point of terminology surfaced was the admissibility of proffered defense testimony from Paulson and “three or four other witnesses who would testify that Ms. McCarrick reached out to them, either spoke to them or sent them text messages that she was afraid of Mr. Paulson and that he was going to hurt—kill her and hurt the girls.” The People insisted that this evidence “doesn’t rise to the level of a hallucination .... Hallucination, as I said in People versus Padilla . . . [¶] . . . [¶] . . . it takes it right from the dictionary. It’s some kind of belief that you are seeing something, hearing something . . . that’s not there. That’s not based on reality. And I don’t think fear . . . [is] hallucination. . . . [H]er fear is based on paranoia . . . .”[10] While the trial court ultimately ruled for the defense on the evidentiary point then under discussion, deciding to allow testimony about McCarrick’s irrational fear of Paulson as it bore on her diminished actuality defense, it did so only within the confines of the People’s legal argument— which incorrectly limited the second prong of Padilla’s holding to hallucination cases. The court ruled: “I am allowing evidence of hallucination and if part of that—if the argument ultimately is fear induced by these is what caused her to not be able to form the ability to premeditate, that can be the argument, I suppose. But the evidence will be as to the actual hallucination.” (Italics added.)[11]
It may be that later, at the close of the guilt phase evidence, when the instructions were argued and settled, it would have been wise for McCarrick’s counsel to propose a pinpoint modification to CALCRIM No. 627, making clear that it covers the type of delusions shown by the evidence in this case. But her failure to make such a request should not come at the price of forfeiture. Her substantial rights were affected by the instruction (Pen. Code, § 1259; see People v. Gray (2005) 37 Cal.4th 168, 235 [33 Cal.Rptr.3d 451, 118 P.3d 496]), and in any event, any effort to seek a modification would *260 likely have been futile. (People v. Boyette (2002) 29 Cal.4th 381, 432 [127 Cal.Rptr.2d 544, 58 P.3d 391]; see People v. O’Connell (1995) 39 Cal.App.4th 1182, 1190 [46 Cal.Rptr.2d 379] [applying “the principle of law that excuses parties for their failure to raise an issue at trial where to do so would have been an exercise in futility” where defendant failed to request clarifying modification of challenged pattern instruction after trial court had unequivocally rejected legal argument supporting the clarification].) By the time the guilt phase instructions were argued and settled, the trial court had already ruled, unequivocally, and unduly narrowly, in my view, that Padilla applies only to hallucinations. Since the court had already announced its interpretation of Padilla, McCarrick was not required to seek reconsideration. At that stage, given what the evidence showed—paranoid delusions based on a misperception of actual facts—the court had a sua sponte duty to correct its own error and add clarifying language to make sure the jury understood CALCRIM No. 627 applies to any form of delusionary thinking, including hallucinations.
As the majority points out, neither side drew any distinction between delusions and hallucinations in closing argument. (Maj. opn., ante, at pp. 245-246.) But everything that happened after the trial court announced its ruling on the scope of the guilt phase evidence of premeditation and deliberation hinged on the court’s narrowly framed ruling. If McCarrick had evidence that she was suffering from “actual hallucinations” (she had none), she was allowed to present it. And if she wanted to argue the hallucination instruction (she had no evidence to do so), she was free to try. Straitjacketed in this manner, counsel did the best she could in closing, attempting to argue to the jury that the hallucination instruction was “very important for you because it’s clear that Ms. McCarrick was perceiving things that weren’t real.” McCarrick should not be penalized on appeal for her counsel’s effort to abide by the ground rules the trial court set. (See People v. Calio (1986) 42 Cal.3d 639, 643 [230 Cal.Rptr. 137, 724 P.2d 1162] [“ ‘An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible.’ ”].)
y.
The People contend that, by not taking issue with defense counsel’s attempt to argue to the jury that McCarrick’s delusions qualified as hallucinations, they in effect “resolve[d] [the] ambiguity in favor of’ the defense. (Middleton v. McNeil (2004) 541 U.S. 433, 438 [158 L.Ed.2d 701, 124 S.Ct. 1830].) To the contrary, they exploited the ambiguity. In response to McCarrick’s argument, all the People had to do was point out that there was no evidence of *261 hallucinations, which, predictably, is exactly what they did when they stated, “There is not one piece of evidence that she was under any form of hallucination on October 12, 2010 . . . .” The point was irrefutable. When McCarrick killed her children, she was not seeing imaginary things, or hearing voices, or in a dream state; she was having real conversations, and reacting to real events, while grossly misreading what was actually happening.
“Jurors are not experts in legal principles; to function effectively, and justly, they must be accurately instructed in the law.” (Carter v. Kentucky (1981) 450 U.S. 288, 302 [67 L.Ed.2d 241, 101 S.Ct. 1112].) Reversal is required where there is a “reasonable likelihood that the jury misapplied or misconstrued” the trial court’s instructions or the underlying law. (People v. Crew (2003) 31 Cal.4th 822, 848 [3 Cal.Rptr.3d 733, 74 P.3d 820].) The toxic combination of potentially ambiguous instructions and misleading arguments by the prosecutor requires reversal when it is likely the jury was misled. (People v. Edelbacher (1989) 47 Cal.3d 983, 995, 1035-1040 [254 Cal.Rptr. 586, 766 P.2d 1]; People v. Roder (1983) 33 Cal.3d 491, 503-505 & fn. 13 [189 Cal.Rptr. 501, 658 P.2d 1302].) In their closing reply before the jury, the People’s use of the literal terms of CALCRIM No. 627 was warranted, since it was based on the court’s announced view of the law—and thus I do not mean to suggest prosecutorial misconduct—but their argument was highly likely to mislead because it invited the jury to give no weight to the evidence of mental disturbance that McCarrick presented.
The resulting prejudice seems plain, whether the instructional error here is viewed as rising to the level of federal constitutional magnitude or simply state law error. While I have no quarrel with the majority’s conclusion that the evidence is sufficient to sustain the jury’s rejection of McCarrick’s sanity phase defense, I cannot agree that “[t]here is no reasonable possibility that the jury interpreted [CALCRIM No. 627] to preclude it from considering defendant’s delusions” at the guilt phase. (Maj. opn., ante, at p. 246.) In my view, it is not only reasonably possible CALCRIM No. 627 short-circuited McCarrick’s guilt phase defense in that way, it is “reasonably probable [she] would have obtained a more favorable result in the absence of error.” (People v. Andersen (1994) 26 Cal.App.4th 1241, 1249 [32 Cal.Rptr.2d 442]; see People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)
The most intuitive, everyday understanding of the term “hallucination,” as evidenced by the dictionary definitions quoted in Padilla, is that it is limited to a situation in which a person perceives something with no objective reality. Perhaps this jury rejected McCarrick’s guilt phase defense on the merits for lack of credibility after concluding that whatever mental disturbance she suffered from in the weeks before the killings was transient and had *262 dissipated by the day of the crimes, which is one reading of the People’s final pitch in their closing reply. More likely—because the evidence overwhelmingly points to profound, long-standing mental illness here, even if McCarrick was sane in the M’Naghten sense—that defense failed on a point of semantics: She suffered from delusions, not from hallucinations.
Accordingly, I join in parts I. and II.B. of the majority’s opinion, but must respectfully dissent from part II.A.
Appellant’s petition for review by the Supreme Court was denied March 15, 2017, S239355. Werdegar, J., and Cuéllar, J., were of the opinion that the petition should be granted.

 “Delusions are deemed bizarre if they are clearly implausible, not understandable, and not derived from ordinary life experiences, (e.g., an individual’s belief that a stranger has removed his or her internal organs and replaced them with someone else’s organs without leaving any wounds or scar's.) In contrast, nonbizarre delusions involve situations that can conceivable occur' in real life (e.g. being followed, poisoned, infected, loved at a distance, or deceived by one’s spouse or lover.)” (DSM-IV-TR, at p. 324.)

 See CALCRIM No. 627, new January 2006, revised February 2015.

 CALCRIM No. 627 is a substantively identical restatement of CALJIC No. 8.73.1, which was introduced in 2003. The sole authority cited in the Use Note for CALJIC No. 8.73.1 is Padilla, supra, 103 Cal.App.4th 675, which was decided in late 2002. (See Use Note to CALJIC No. 8.73.1 (7th ed. 2003).)

 CALCRIM No. 627, as revised in February 2015, cites as authority not only Padilla, but Mejia-Lenares and Elmore as well. (Use Note to CALCRIM No. 627 (Feb. 2015 rev.).)

 E.g., Elmore, supra, 59 Cal.4th at page 146; Mejia-Lenares, supra, 135 Cal.App.4th at pages 1444, 1454; see also People v. Gutierrez (1986) 180 Cal.App.3d 1076, 1080, 1084 [225 Cal.Rptr. 885] (defendant experienced “irrational delusions” as evidenced by statements that “she started seeing her children as birds on the day in question and ‘didn’t know they were children at that time’ ” and “just wanted to kill the birds because she felt they were an evil force”).

 E.g., People v. Wetmore (1978) 22 Cal.3d 318, 322, 321 [149 Cal.Rptr. 265, 583 P.2d 1308] (Wetmore) (in burglary case against defendant with a “long history of psychotic illness” who *257 “entered an apartment under a delusion that he owned that apartment and thus did not enter with the intent of committing a theft or felony,” conviction reversed on ground that excluded psychiatric evidence of mental illness was admissible to negate specific intent), superseded by statute as explained in Mills, supra, 55 Cal.4th at page 671.

 E.g., People v. Leeds (2015) 240 Cal.App.4th 822, 825-828 [192 Cal.Rptr.3d 906] (reversing sanity verdict for instructional error where defendant, who mistook his father for an intruder, shot him to death and then chased down and killed two of his father’s employees, believing them to be assassins sent by the Mexican Mafia; defendant had a “well-documented history of delusions and hallucinations,” claimed to have seen helicopters in the sky and missiles being fired, displayed “fearful and panicky demeanor just before the killings, and [had a] false belief that his father was brandishing a pistol when he kicked open the door to the back office”); People v. Nicolaus (1967) 65 Cal.2d 866, 873, 875 [56 Cal.Rptr. 635, 423 P.2d 787] (defendant described by a psychiatrist as being “delusional” and suffering from “visual and auditory hallucinations” when he killed his three children, “frequently made irrational statements; [said] he was like God; [said] he could perform miracles and control the world; . . . believed devoutly in Nazism as a way of life, sometimes . . . reacted abnormally and violently to commonplace occurrences; . . . believed everyone was against him; . . . felt his mother-in-law was trying to break up his marriage and made violent threats to her”; first degree capital murder convictions reduced to second degree on automatic appeal to California Supreme Court), disapproved on other grounds in Wetmore, supra, 22 Cal.3d at pages 323-325 and footnote 5; People v. Wells (1949) 33 Cal.2d 330, 344-345, 354 [202 P.2d 53] (life prisoner who possessed “abnormal fear' for his personal safety” (italics omitted), causing him to “react to [a perceived threat] more violently and more unpredictably than the same stimulus applied to a normal person (italics omitted),” even though “laboring under . . . some insane delusion or hallucination,” was still capable of the “malice aforethought” necessary to support conviction for assaulting a guard, thus subjecting him to a capital sentence under section Pen. Code, § 4500; conviction and sentence affirmed on automatic appeal to California Supreme Court), disapproved on other grounds in Wetmore, supra, 22 Cal.3d at pages 323-325 and footnote 5.

 As I read Padilla, there was no “actual killing,” which is why appellant Padilla’s description of that supposed event is described as a hallucination.

 From what little evidence there is in the published cases of how CALCRIM No. 627 and CALJIC No. 8.73.1 are used in practice, there is some indication that trial courts recognize the need to modify it where, as here, reality-based delusions are involved, or are mixed with non-reality-based delusions. In People v. Gana (2015) 236 Cal.App.4th 598, 601 [186 Cal.Rptr.3d 724], for example, the defendant, Gana, was convicted of first degree murder for shooting her husband to death and the willful, deliberate and premeditated attempt to shoot her two sons. She had breast cancer, her mental state was affected by chemotherapy drugs, she was suffering from major depression, and believed her family could not live without her, and thus felt she needed to kill them so “ ‘we can all die together.’ ” (Id. at p. 605.) For weeks before the killing, Gana “had suicidal thoughts and developed a plan to kill her husband and children before taking her own life. [She] told the investigators she heal'd a voice in her head telling her that she needed to carry out her scheme.” (Id. at p. 603.) At trial she claimed she did not premeditate and deliberate, and CALJIC No. 8.73.1 was one of the jury instructions given. (Gana, at pp. 604-605.) The Court of Appeal described the instruction as follows: “CALJIC No. 8.73.1 (evidence of hallucination or delusion may be considered ‘on the issue of whether’ defendant ‘killed or attempted to kill with or without deliberation and premeditation and/or lying in wait’).” (Id. at p. 605, italics added; see also id. at p. 614 [quoting what appeal's to be prosecutor’s paraphrase of CALJIC No. 8.73.1: “ ‘If you find it to be true that the defendant suffered from a hallucination and/or delusion, you may consider the impact of this hallucination and/or delusion, if any’ ” (italics added)].)

 The prosecution argued “[t]hat is not a hallucination. That is paranoia, but there is a difference. Hallucination is seeing things, hearing things. I mean, it’s right in that Padilla case.”

 The corn! also ruled, “I am going to allow you to bring in evidence of hallucination on the issue of ability to deliberate and premeditate, but that is as far as it goes.” It noted “there is no question that hallucination, evidence of hallucinations can have a bearing and is relevant on the issues of premeditation and deliberation, and that is supported by . . . this Padilla case.” And again, it said, “I’m going to allow at least a good portion of this evidence, provided it does in fact show the defendant was suffering from hallucinations about this time.”